[No. B196889. Second Dist., Div. Seven. Apr. 22, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS MARGAREJO, Defendant and Appellant.

## COUNSEL

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Paul M. Roadarmel, Jr., and Nancy G. James, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

WILEY, J.*—This case is a substantial evidence review about gang enhancements. Luis Margarejo led police on a long car chase. During the chase, Margarejo—a member of the Highland Park gang—continually made the Highland Park gang sign to pedestrians he passed. Margarejo even made this sign *to the police*. Police spied Margarejo's gun when he decided to sprint from his car. They followed him to an apartment, where they found the gun. A jury convicted Margarejo of four crimes: evading police officers; felon in possession of a gun; concealed gun in a car; and misdemeanor obstruction of government administration. On the first three crimes, the jury found a gang allegation to be true.

On appeal, Margarejo makes three arguments. All concern the gang enhancements. His first argument is that the jury had no good basis for finding that Margarejo's Highland Park gang was a "criminal street gang." His second argument is that no evidence showed his evasion of police was related to his gang. His third argument is that no evidence showed his gun possession was gang related.

We affirm.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

I

The police knew Margarejo from 2004. LAPD (Los Angeles Police Department) Officer Julio Duarte arrested Margarejo back in 2004. At that time, Margarejo told Duarte he belonged to the Highland Park gang. This fit with the large Highland Park gang tattoo on the back of Margarejo's head. Margarejo also had Highland Park gang tattoos on his arms.

Move now to 2006. On January 25, 2006, Margarejo had an outstanding warrant for a felony parole violation. Duarte and his partner were in a marked police cruiser. They saw Margarejo run a stop sign about 3:30 p.m. Duarte signaled him to pull over, but Margarejo defied the command and sped away.

Margarejo led a chase that would last for some 17 or 18 minutes and that would attract the attention of nearly a dozen police cars, as well as a police helicopter.

Margarejo decided to introduce the Highland Park gang sign as a feature of the chase. The Highland Park gang sign is a hand signal. The gang member moves his fingers to form first an H, then a P.

As Margarejo sped away, he began to make the Highland Park gang sign to pedestrians he was passing. Then he got on the freeway and began weaving and speeding through traffic. Margarejo flashed the gang sign at "[a]lmost every single car that he passed on the freeway . . . ."

Margarejo left the freeway, nearly crashed, and continued speeding. He ran stop signs. Margarejo flashed more gang signs as he passed pedestrians on the surface streets.

Margarejo began driving on the wrong side of the street. He ran another red light, scattering pedestrians in the walkway. Margarejo made gang signs to the scrambling pedestrians.

Margarejo then continued to speed and to run more stop signs. He drove past more people. Upon seeing pedestrians, he would again extend his left hand out the driver's side window and repeat the hand gestures he was making throughout the pursuit.

Margarejo continued speeding. He attempted a left turn, lost control, and almost hit a sidewalk curb. He nearly came to a stop, then made a U-turn. His car briefly faced the nearest police car. A pursuing officer testified: "I was looking right at him. It appeared he was looking at me. It looked like he was laughing. And then he made those same hand gestures in my direction."

During the car chase, Margarejo committed some 80 moving violations.

Eventually Margarejo stopped the car and ran on foot. Police saw he was carrying a gun. They ran after him to unit No. 110 in an apartment building. Police arrested Margarejo, but now he no longer had the gun. Police got a safe out of unit 110 and inside found the loaded .40-caliber Beretta semiautomatic pistol. Margarejo told police the Beretta "belonged to him, not his homie, he told me Little G, that was his homie's name." Police knew Little G was a Highland Park gang member named Richard Gonzalez. Gonzalez was living in unit No. 110. Margarejo and Gonzalez are good friends.

## II

Gang enhancements are statutory. The statute says this: "[A]ny person who is convicted of a felony committed *for the benefit of, at the direction of, or in association* with any *criminal street gang,* with the specific intent to promote, further, or assist in any criminal conduct by gang members," shall suffer added punishment. (Pen. Code, § 186.22, subd. (b)(1), italics added; all further statutory references are to the Penal Code.)

The statute also says that " 'criminal street gang' means any ongoing . . . group of three or more persons, whether formal or informal, having as one of its *primary* activities the commission of one or more of the criminal acts enumerated [elsewhere], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.)

The statute defines "pattern of criminal gang activity." (§ 186.22, subd. (e).)

## III

Margarejo's first argument is that there was no evidence to support the gang enhancements because there was no valid basis for finding that Margarejo's Highland Park gang was a "criminal street gang."

Margarejo admitted to police he was a member of this gang, and he had the tattoos to prove it. The issue is different. Margarejo submits the following testimony is wanting:

"[Prosecution]: Now, what are the *primary activities* of the Highland Park criminal street gang?

"[LAPD Officer Steven Aguilar]: Their *activities* range from simple vandalism and battery, and can extend all the way to murder. They also include consolidated weapons, carjackings, robberies and a lot of narcotic related offenses." (Italics added.)

The statute requires a showing of "primary activities." (§ 186.22, subd. (f).) Margarejo faults Aguilar's testimony because his quoted sentence left out the word "primary" in front of the word "activities."

This point is insubstantial. Counsel's questions themselves are not evidence, but the question's wording typically is relevant to a reasonable interpretation of the witness's answer. Often it is vital to consider the question to understand *anything* about the answer, as with answers like "yes."

Here the jury had ample reason to infer that Aguilar's answer implicitly incorporated the word "primary" from the question. Ordinary human communication often is flowing and contextual. Jurors know this. Repetitive and stilted responses make up one kind of direct examination, but not the only kind. Margarejo's objection here calls for an unreasonably restrictive interpretation of Aguilar's answer, which we respectfully decline.

Margarejo also claims support from *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611–614 [57 Cal.Rptr.3d 226]. That case is not on point. The People correctly note that the expert in *Alexander L.* equivocated on direct examination and contradicted himself on cross-examination. Here expert Aguilar did neither.

Margarejo responds to the People's distinction as follows: "While perhaps Officer Aguilar did not equivocate as did the expert in *Alexander L.*, this is not relevant as Officer Aguilar never offered an opinion as to Highland Park's *primary* activities." On cross-examination, however, Aguilar gave the following answers:

"[Defense Counsel]: When Ms. Pott, the prosecutor, asked you about the *primary activities* of the Highland Park gang, what did you think she meant by that?

"[LAPD Officer Steven Aguilar]: The *primary activities* of the gang?

"[Defense Counsel]: Yes.

"[LAPD Officer Steven Aguilar]: What do they do out there, what's the point of the gang, what are their activities, what do they do out there?

"[Defense Counsel]: And you started talking about crimes. [¶] Aren't there other activities?

"[LAPD Officer Steven Aguilar]: I'm sure there is, but *their main activity, their primary activities, I would say are to complete crimes.*

"[Defense Counsel]: *Including murder?*

"[LAPD Officer Steven Aguilar]: *Yes.*" (Italics added.)

The expert testified the gang's primary activities included murder. There was no such testimony in *Alexander L.* This case is different from *Alexander L.,* which does not apply here.

In sum, there was substantial evidence to support the jury's finding that Margarejo's gang met the statutory criteria.

## IV

Margarejo's second argument concerns the gang enhancement for his crime of evading police. Margarejo says there was no evidence for the jury to say his car chase was gang related.

■ The gang enhancement statute sets out requirements. There must be a felony, and the felony must have been "committed *for the benefit* of, *at the direction* of, *or in association with any criminal street gang,* with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1), italics added.)

The jury had enough evidence to conclude that Margarejo committed his flight for the benefit of the Highland Park gang with the specific intent of assisting criminal conduct by gang members.

Margarejo behaved uncommonly during the chase. In fact, one pursuing officer testified that, in his 22 years of law enforcement experience, this was a first. He had never seen anyone else make gang signs to pedestrians during a chase. Nearly all of the pedestrians to whom Margarejo sent his gang message looked like they did not belong to gangs. So Margarejo was declaring, not to fellow or rival gang members, but to the public at large. And the evidence was that many people in that area are familiar with the Highland Park gang.

There was direct testimony to explain Margarejo's motive. An officer said "the Highland Park gang . . . [uses] intimidation and fear to create an air of terror in their communities, and by letting these people know that despite the fact that he's being pursued by the police, despite the fact that his arrest is imminent, he's still claiming that Highland Park gang is in charge of the area. He's creating an air for the common person, the average person on the street[,] of fear and intimidation . . . ." So the message was that, "despite the fact that [Margarejo] was being pursued by the police, Highland Park gang is still in charge."

There was also this testimony:

"[Prosecution]: What do you think the laughing did, what role did that play, what was going on when [Margarejo] was laughing, yet terrorizing?

"[LAPD Officer Duarte]: I believe that it was showing an attitude of, 'I don't care,' an attitude of 'the laws don't apply to me,' an attitude of 'the gang is above the law,' a basic total disregard for the laws that govern a normal community. The entire pursuit, the entire incident appeared to be a joke to [Margarejo]. [¶] . . . [¶] He was taking it seriously to the effect that he wasn't stopping, but he was—he was enjoying himself apparently during the entire event."

It is remarkable for a person in a high-speed chase to make gang signs to pedestrians and *to the police*. Why bother with this effort to communicate? It cannot aid the ordinary goal of an attempted escape, which is to escape. Without objection, an officer testified Margarejo's signing was to "intimidate the community, intimidate us." The jury could reasonably have found Margarejo's message to be clear: *Highland Park gang does not fear police,*

*so you better fear us.* A community cowed by gang intimidation is less likely to report gang crimes and to assist in their prosecution. The gang benefit is plain. There was ample basis for the jury to conclude Margarejo was serving the criminal purposes of the Highland Park gang by turning his flight into a public display of laughing, taunting defiance.

Margarejo does "concede" a jury reasonably could have found that his flashing of gang signs "was done to intimidate the residents of the area to the benefit [of] the gang; i.e., by intimidating residents[,] they are less likely to report crimes and/or testify against gang members." Margarejo also comments that "perhaps, in flashing gang signs, [Margarejo] sought to accomplish the intimidation of the members of the neighborhood claimed by his gang . . . ." This candor does credit to Margarejo's counsel.

■ Margarejo nonetheless argues there was no evidence Margarejo committed the crime *for the purpose and with the intent* of benefiting his gang. But we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say. ■ Here, Margarejo acted like he wanted to help his gang. His actions did his own escape no good. When fleeing at high speed, it is better to keep both hands on the wheel and to avoid creating a striking impression in the mind of every witness along the way. Logically, Margarejo must have had another purpose for staging this show. The message he broadcast—the *only* message he broadcast—was the gang message. The logical purpose was to accomplish the foreseeable effect: to proclaim the gang's dominance in the teeth of a determined police effort to enforce the law. The jury had an ample basis for concluding Margarejo was telling everyone he could that his gang was still in charge, despite the police pursuit. The jury could reasonably conclude Margarejo had "the specific intent to . . . assist [other] criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)

Margarejo says we should credit his statement to police upon capture: that his evasion had the purpose of avoiding arrest on his outstanding warrant. Margarejo's stated explanation is wanting. It does not explain his stream of gang signs. Margarejo conspicuously proclaimed his gang under startling circumstances. His efforts to communicate were continuous and systematic. The jury was entitled to find he had turned this pursuit into a reckless and attention-getting parade, and the parade into a gang crime. There was a sufficient basis in the record for the gang enhancement.

## V

Margarejo's third argument is that no evidence supported the gang enhancement of his conviction for gun possession. This argument gives too little credit to the record.

The evidence gave the jury an ample basis for concluding Margarejo's gun possession was gang related. Jurors reasonably could conclude he "committed [the gun possession] . . . *in association* with any *criminal street gang,* with the specific intent to . . . assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1), italics added.) Because Margarejo had been convicted of a felony, it was illegal for him to possess this (or any) gun. Margarejo tried to avoid being caught with the gun in hand. But Margarejo did not throw the gun away. He took it to Little G's apartment and left it there. Leaving an illegal gun with a fellow gang member connects the gun and the gang. Margarejo apparently took pains to keep the gun within the gang. The jury fairly could infer his goal was to preserve the gun for the gang's future use. The jury was entitled to conclude this gun was a gang gun—a gun that Margarejo wanted to maintain as available to the Highland Park gang, whatever might happen to Margarejo himself. Some people use guns for hunting and sport, but the evidence suggested that the Highland Park gang used guns to commit gang crimes.

Margarejo suggests it is "entirely speculative" to think a gang member might possess a gang gun to assist in gang crimes. Respectfully, however, this inference is reasonable.

Margarejo cites *In re Frank S.* (2006) 141 Cal.App.4th 1192 [46 Cal.Rptr.3d 839]. In that case, the court found there was no valid evidence to support the gang expert's assertion that Frank S. possessed a knife for gang purposes. (*Id.* at p. 1199.) Unlike Frank S., however, Margarejo transferred his illegal weapon to a fellow gang member, thus suggesting the weapon was a gang weapon. This case differs from *Frank S.*

The evidence supported the jury's finding on the gang enhancement for Margarejo's gun crime.

## VI

Because there was substantial evidence to support the judgment in all respects, Margarejo's claim of a due process violation has no basis.

## VII

The judgment is affirmed.

Perluss, P. J., and Woods, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 23, 2008, S163859.